IN THE UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF WISCONSIN

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

EMD CROP BIOSCIENCE INC. and
EMD CROP BIOSCIENCE CANADA INC.,                    OPINION and ORDER

                Plaintiffs,                                   10-cv-283-bbc

    v.

BECKER UNDERWOOD, INC.,

                Defendant.

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

      In this case for monetary and injunctive relief, plaintiffs EMD Crop Bioscience, Inc.

and EMD Crop Bioscience Canada Inc. contend that defendant Becker Underwood, Inc. is

infringing plaintiffs' United States Patent No. 6,979,664 (the '664 patent) and defendant

is liable for false marking of its products under 35 U.S.C. § 292.  Now before the court is

defendant's motion to dismiss the infringement claim for lack of standing under Fed. R. Civ.

P. 12(b)(1) and the false marking claim for lack of standing as well as for failure to state a

claim upon which relief may be granted under Rule 12(b)(6), dkt. #9.

      I conclude that plaintiff EMD Crop Bioscience Inc. lacks standing to assert a claim

for infringement of the '664 patent because it is neither a co-owner nor an exclusive licensee

of the patent.  Therefore, I will grant defendant's motion to dismiss plaintiff EMD Crop Bioscience, Inc.'s patent infringement claim for lack of standing.  Also, I conclude that although plaintiff EMD Crop Bioscience Canada is a co-owner of the '664 patent, it does not possess all substantial rights to the patent and therefore cannot sustain an infringement claim without joining the other co-owner, McGill University, as a party to the lawsuit. However, rather than dismiss EMD Crop Bioscience Canada's infringement claim, I will give it an opportunity to join McGill University as a party.  With respect to plaintiffs' false marking claim, I conclude that both plaintiffs have standing to assert the claim and have satisfied the pleading requirements of Fed. R. Civ. P. 9.  Therefore, I will deny defendant's motion to dismiss the false marking claim.

Because defendant's motion to dismiss raises questions of standing and jurisdiction, I have considered materials outside the pleadings in resolving the standing matter, as the court is permitted to do.  Apex Digital, Inc. v. Sears, Roebuck & Co., 572 F.3d 440, 443-44 (7th Cir. 2009); Capitol Leasing Co. v. Federal Deposit Insurance Corp., 999 F.2d 188, 191 (7th Cir. 1993).  I draw the following facts from the pleadings and the documents the parties have submitted in connection with their briefing of the motions.

FACTS

A.  <u>'664 Patent</u>

The patent at issue in this case is United States Patent No. 6,979,664 (the '664 patent), titled "Composition for Accelerating Seed Germination and Plant Growth."  The '664 patent was issued by the United States Patent and Trademark Office on December 27, 2005.  The patent inventors filed a notice of assignment with the United States Patent and Trademark office, assigning their rights in the patent to Bios Agriculture Inc. and McGill University.

B.  <u>McGill University License Agreement</u>

A 2004 license agreement entered into between McGill University and Agribiotics Holdings, Inc. covers the '664 patent.  Dkt. #22-3.  Under the license agreement, McGill University granted "exclusive royalty bearing license rights" to Agribiotics Holdings for existing and future patents concerning an invention titled "Composition for Accelerating Plant Seed Germination and Plant Growth."  The inventors of the invention had previously assigned the ownership rights to McGill and Bios Agriculture Inc.  The license agreement granted Agribiotics Holdings the following rights and responsibilities, among others:

- The right to use, reproduce, develop, manufacture, distribute, sell, lease or transfer products covered by the invention, § 3.1.2;

3

- The right to grant sublicenses without prior authorization from McGill University, § 3.2, but only to parties that "demonstrate a strong capability and specific plans for the effective development and marketing" of the patented products.  In addition, the sublicenses must refer to the license agreement between McGill and Agribiotics Holdings and refer to all rights retained by McGill;

- The right to own any improvements Agribiotics Holdings conceived, § 3.5;

- The responsibilities for patent maintenance, §§ 9.1.1, 9.2.1, 9.2.4;

- The obligation to notify McGill of any potential infringement, § 11.1;

- The obligation to stop infringement, sue infringers or enter into a settlement and licensing agreement with infringers, §11.2.  However, § 11.2.2 exempts Agribiotics Holdings from suing or notifying McGill regarding potential infringement for any product that incorporates part of United State Patent serial no. 10/146,034;

McGill University retained several rights and obligations under the license agreement:

- The  right to use and practice the patents for its own academic purposes, including for the benefit of third parties, § 3.3;

- The right to any improvements it conceives, § 3.6;

- The right to consult and collaborate with Agribiotics Holdings regarding patent prosecution, foreign patent applications and patent attorneys, §§ 9.1, 9.1.2, 9.1.3;

- The obligation to notify Agribiotics Holdings if McGill becomes aware of any potential infringement of the patents, § 11.1;

- The right to receive royalties from licensed products and any settlement agreement entered into by Agribiotics Holdings, § 4.3;

- The secondary right to sue to enforce the patents if Agribiotics Holdings does

4

not fulfill its obligation within six months, § 11.2;

• The right to modify or terminate the agreement if Agribiotics Holdings fails to stop infringement, § 11.2, fails to use commercially reasonable efforts to market the patents, § 7.1, or otherwise breaches the agreement, § 12.3;

• The right to prevent Agribiotics Holdings from assigning its rights without McGill's written consent.  McGill's consent cannot be withheld unreasonably, § 13.1;

• All rights not expressly granted to Agribiotics Holdings, § 3.4.

### C.  Dissolution of Bios Agriculture and Amalgamation of Agribiotics

On March 24, 2006, Bios Agriculture Inc., the co-owner of the '664 patent with McGill University, entered into a dissolution agreement with Agribiotics Inc.  Dkt. #22-4. (Agribiotics Inc. is not the same entity as Agribiotics Holdings, the licensee under the 2004 agreement with McGill University).   Under the dissolution agreement, Agribiotics Inc. acquired Bios Agriculture and Bios "convey[ed], assign[ed], transfer[ed] and deliver[ed]" all of its rights to all of its property to Agribiotics, Inc.  Bios also agreed to provide any other documents necessary "for more effectually and completely vesting the property and assets conveyed hereunder in [Agribiotics] or for the purpose of registration or otherwise."  The dissolution agreement did not mention any patent specifically.

Also on March 24, 2006, Agribiotics Holdings (the licensee under the McGill license agreement), Agribiotics Inc. (the company that had acquired Bios Agriculture), Agribiotics

5

Research and Development Inc. and Nitragin Holding Inc. signed an amalgamation agreement under which they were all consolidated into Agribiotics Inc. Dkt. #22-5. Under the amalgamation agreement, each of the companies, including Agribiotics Holdings, agreed to "amalgamate" and "to continue as one corporation," with Agribiotics Inc. "possess[ing] all the property, rights, privileges and franchises . . . of each of the Amalgamating Corporations." The amalgamation agreement did not identify assets or property of the corporations specifically.

On March 23, 2006, before the amalgamation agreement was executed, Agribiotics Holdings wrote to McGill University regarding license agreements between the two entities. Agribiotics Holdings stated that "[t]he shareholders of [Agribiotics Holdings] propose to enter into a share purchase agreement pursuant to which all the shares of the corporation will be sold. . . In connection with the Proposed Transaction, the shareholders of the Corporation wish to confirm certain information in respect to the status of the Licenses." Dkt. #35-2. The letter asked McGill University to confirm that "(a) [Agribiotics Holdings] has the right to grant the license . . . ;(b) the Licenses are valid and enforceable . . .; (c) [Agribiotics Holdings] is not in breach of any term or condition of the License; and (d) [Agribiotics Holdings] currently meets all of its obligations under the License." A McGill University representative signed the confirmation letter.

6

### D.  Plaintiff EMD Crop Bioscience Canada, Inc.

On August 1, 2006, Agribiotics Inc. (the amalgamated corporation) changed its name to EMD Crop Bioscience Canada Inc. (plaintiff in this case).  Dkt. #22-6.  On September 28, 2006, EMD Crop Bioscience Canada Inc. emailed McGill University an amendment to the license agreement between McGill University and Agribiotics Holdings Inc.  Dkt. ##22-7.  This document is titled "Amendment #1 to License Agreement with EMD Crop Bioscience 'Technologies: Emerge (99032), Signal (#94038) and Photosynthesis (#99093).'" (For ease of reference, I will refer to EMD Crop Bioscience Canada Inc. as EMD Canada.) The amendment was executed by  EMD Canada and McGill on October 16, 2008.  Dkt. #35-3.  The document states that it is incorporating changes into

> the License Agreements all executed June 28, 2004, initially between McGill University and Agribiotics Holdings Inc.  The rights of all of the licenses were subsequently transferred to Nitragin Inc. upon their acquisition of Agribiotics Holdings Inc. on March 24, 2006.  Subsequently, Nitragin Inc. changed its name to EMD Crop BioScience as of August 1, 2006.

All of the proposed amendments on the document relate to a "Schedule C" in a license agreement.

Plaintiff EMD Crop Bioscience Inc. (EMD U.S.) has the permission of and authorization from plaintiff EMD Canada to practice the '664 patent and distribute products covered by the '664 patent in the United States.

### E.  Defendant's Vault HP Product

Defendant Becker Underwood, Inc. has used, offered for sale, marketed and sold a product called Vault HP for use with soybeans in the United States, including the Western District of Wisconsin.  Defendant markets the Vault HP product as "Contain[ing] Patented Growth-Enhancing Technology!" and lists United States Patent No. 7,262,151.  The package also claims protection under United States Patents Nos. 5,061,495 and 5,344,647, related to Vault HP's use of "Integral A Liquid Biological Fungicide."   Defendant revised the product's literature regarding Integral in November 2009 and began shipping the Vault HP product in spring 2010.

On November 13, 2009, plaintiffs gave defendant notice of the '664 patent and began seeking information to confirm defendant's infringement of the '664 patent.

## OPINION

### A.  Standing to Assert Patent Infringement

Standing to sue is a threshold question.  The party bringing the action bears the burden of establishing it.  Sicom Systems, Ltd. v. Agilent Technologies, Inc., 427 F.3d 971, 975-76 (Fed. Cir. 2005); Hinrichs v. Speaker of the House of Representatives, 506 F.3d 584, 590 (7th Cir. 2007).  If the plaintiff lacks standing, a defendant may bring a motion to dismiss for lack of subject matter jurisdiction under Fed. R. Civ. P. 12(b)(1).  Apex Digital,

572 F.3d at 443-44.  If standing is challenged as a factual matter, as it is in this case, the plaintiff must come forward with "competent proof," showing by a preponderance of the evidence that standing exists.  Id.; Lee v. City of Chicago, 330 F.3d 456, 468 (7th Cir. 2003).

A party's standing to sue for patent infringement derives from the Patent Act, which provides that "[a] patentee shall have remedy by civil action for infringement of his patent." 35 U.S.C. § 281; Enovsys LLC v. Nextel Communications, Inc., 614 F.3d 1333, 1341 (Fed. Cir. 2010).  "Patentee" includes not only the party to whom the patent was issued, but also the successors in title to that party, 35 U.S.C. § 100, including those to whom the patent has been assigned ownership or an exclusive license.  Propat International Corp. v. Rpost, Inc., 473 F.3d 1187, 1193 (Fed. Cir. 2007).  Thus, for plaintiffs to have standing, they must present evidence that they have either an exclusive license to the '664 patent or an ownership interest in the '664 patent.  Sicom Systems, 427 F.3d at 976.  Non-exclusive licensees do not have standing to sue for infringement, even if the patent owners are also parties to the suit.  Id.  In addition, if there are co-owners, each must join in the action unless one party holds all substantial rights in the patent.  Israel Bio-Engineering Project v. Amgen, Inc., 475 F.3d 1256, 1264-65 (Fed. Cir. 2007) ("Absent the voluntary joinder of all co-owners of a patent, a co-owner acting alone will lack standing."); Ethicon, Inc. v. United States Surgical Corp., 135 F.3d 1456, 1468 (Fed. Cir. 1998) (recognizing that, as result of

9

this rule, "one co-owner has the right to impede the other co-owner's ability to sue infringers by refusing to voluntarily join in such a suit").

As an initial matter, plaintiffs have conceded that plaintiff EMD U.S. (EMD Crop Bioscience Inc.) has only a non-exclusive license to practice the '664 patent.  Thus, this plaintiff lacks standing to sue for patent infringement.

The remaining questions are whether plaintiff EMD Canada (EMD Crop Bioscience Canada Inc) lacks standing to sue for infringement because it is not a co-owner of the '664 patent or an exclusive licensee of the patent; and whether, even if EMD Canada is a co-owner that possess an exclusive license to the patent, the other co-owner of the patent, McGill University, must be joined as plaintiff in this suit.

1.  Co-ownership of the '664 patent

Plaintiff EMD Canada contends that it acquired co-ownership of the patent through a chain of title that moved from Bios Agriculture, Inc., to Agribiotics, Inc., to the amalgamated Agribiotics Inc. and finally to EMD Canada.   Specifically, EMD Canada alleges that the March 24, 2006 dissolution agreement assigned all Bios Agriculture's rights to the '664 patent to Agribiotics Inc., and the March 24, 2006 amalgamation agreement among the several Agribiotics companies transferred all assets of the companies, including co-ownership of the '664 patent, to the amalgamated Agribiotics, Inc.   Finally, when

10

11Agribiotics, Inc. changed its name to EMD Canada, it retained co-ownership of the patent.

Defendant contests the asserted validity of the chain of transfer.  First, defendant contends that the dissolution agreement did not assign Bios Agriculture's rights in the '664 patent to Agribiotics, Inc.  Defendant argues that at most, the dissolution agreement is an "agreement to assign" because it contains no specific language identifying the '664 patent as being assigned to Agribiotics, Inc.  Likewise, defendant contends that because the amalgamation agreement entered into by the various Agribiotics companies contained no specific language identifying the patent, ownership rights in the patent were not transferred to the amalgamated Agribiotics Inc.

Generally, the Court of Appeals for the Federal Circuit applies federal law to determine the validity and terms of an assignment for patent rights.  Sky Technologies LLC v. SAP AG, 576 F.3d 1374, 1379 (Fed. Cir. 2009) ("[F]ederal law is used to determine the validity and terms of an assignment."); DDB Technologies, L.L.C. v. MLB Advanced Media, L.P., 517 F.3d 1284, 1290 (Fed. Cir. 2008); but see Euclid Chemical Co. v. Vector Corrosion Technologies, Inc., 561 F.3d 1340, 1343 (Fed. Cir. 2009) ("Construction of patent assignment agreements is a matter of state contract law.") (citation omitted).  The parties do not deny that federal law applies.

The Federal Patent Act requires that all assignments of patent rights be in writing. 35 U.S.C. § 261 (2006).  Defendant contends that a valid assignment under patent law

11

satisfies the "in writing" requirement only if it identifies the patent by patent number. Defendant cites 37 C.F.R. § 3.21, a regulation passed by the United States Patent and Trademark Office, which states that "[a]n assignment relating to a patent must identify the patent by the patent number." However, this regulation relates to the identification of patents and patent applications for *recordation* at the Patent and Trademark Office. It does not address the legal validity of an assignment.

The only other support defendant cites for the proposition that "patent law is clear that the agreement transferring the patent must identify the patent with specificity," Dft.'s Br., dkt. #29, at 10, is Judge Newman's concurrence and dissent in Euclid Chemical, 561 F.3d at 1349. Judge Newman observed that the "practice requiring specificity in identification of transferred patents is so entrenched, that it would smack of misfeasance to have omitted the known [second] patent from the list of assigned properties, if the parties had intended that it be assigned." Id.

The question in Euclid was whether an ambiguous assignment transferred ownership of a certain patent. The assignment identified one patent, four pending patent applications, continuations, continuations-in-part and divisionals. Id. at 1342. The patent at issue was not identified specifically in the assignment even though it had been issued before the assignment was executed. However, it was a continuation-in-part of the single patent identified in the assignment. Id. The court of appeals reversed the finding by the district

12

court that the assignment assigned the specific patent unambiguously, remanding with instructions that the district court consider extrinsic evidence to determine whether the assignment transferred ownership.  Id. at 1343-44.  The court pointed out that the language of the assignment was specific, transferring one patent (singular) and four patent applications (plural).  Id. at 1344.  The court also noted that because the disputed patent had been issued before the assignment was executed, it would be expected that if the assignor were assigning all of his patents, the assignment would have said patents (plural) and would have recited the patent number.  The court concluded that there were two reasonable interpretations of the assignment language and that extrinsic evidence should have been considered to ascertain the parties' intent.  Id.  In sum, the court of appeals concluded that it was unclear whether the agreement assigned the patent at issue.  The court did not hold, as defendant suggests, that identification of the specific number was required for a valid assignment; rather, the court held that it could be evidence of the parties' intent.

In other cases, the Court of Appeals for the Federal Circuit has found an assignment valid regardless whether it mentioned a specific patent number.  E.g., Board of Trustees of Leland Stanford Junior University v. Roche Molecular Systems, Inc., 583 F.3d 832, 842 (Fed. Cir. 2009) (concluding that present assignment was effected through language that "I will assign and do hereby assign . . . my right, title, and interest in each of the ideas, inventions and improvements.");  Speedplay, Inc. v. Bebop, Inc., 211 F.3d 1245, 1253 (Fed.

Cir. 2000) (concluding that valid assignment created by agreement stating all inventions "shall belong exclusively to [plaintiff] and [inventor] hereby conveys, transfers and assigns to [plaintiff] . . . all right, title and interest in and to Inventions.")

In this case, the language of the dissolution agreement is not ambiguous. It states that "Bios hereby conveys, assigns, transfers and delivers to [Agribiotics, Inc.] all of its right, title, estate and interest to all its property, assets, business and undertaking, both real and personal, movable and immovable, wherever situate . . . ." Dkt. #22-4. The agreement conveys all of Bios Agriculture's assets, not a select recitation of itemized assets, as in Euclid. Nothing about the language of the agreement or the surrounding circumstances suggests that the assignment excluded patents, which are treated generally as personal property. 35 U.S.C. § 261 ("[P]atents shall have the attributes of personal property."); Israel Bio-Engineering Project, 475 F.3d at 1264 ("Patent owners may assign or transfer their ownership interests in the patent as personal property.")

In addition, nothing about the language of the agreement makes this an "agreement to assign" at a later time, as defendant contends. The language of the dissolution agreement states that Bios "conveys, *assigns*, transfers and delivers" all of its property to Agribiotics, Inc. Dkt. #22-4. This language indicates that Bios had a present intent to assign its property to Agribiotics and that the dissolution agreement constitutes an actual assignment, not merely an agreement to assign in the future. Compare IpVenture, Inc. v. Prostar Computer, Inc.,

14

503 F.3d 1324, 1327 (Fed. Cir. 2007) (interpreting "agree to assign" as "an agreement to assign," requiring a subsequent written instrument), Arachnid, Inc. v. Merit Industries, Inc., 939 F.2d 1574, 1580-81 (Fed. Cir. 1991) (holding that "will be assigned" does not create "a present assignment of an expectant interest"), with Leland Stanford Junior University, 583 F.3d at 842 (interpreting "I will assign and do hereby assign" as "present assignment"), DDB Technologies, 517 F.3d at 1290 (construing contractual language in an employment agreement stating "agrees to and does hereby grant and assign" as assignment and not agreement to assign), and Speedplay, Inc., 211 F.3d at 1253 (interpreting "shall belong" and "hereby conveys, transfers and assigns" as present assignment).  Although the dissolution agreement also includes a statement that Bios will provide any other document necessary "for more effectively and completely vesting the property and assets conveyed hereunder in [Agribiotics Inc.] or for the purpose of registration or otherwise," this language suggests only that Bios will perform any ministerial tasks necessary to effectuate the transfer of its assets. It does not undermine the conclusion that the dissolution was a present assignment of assets to Agribiotics Inc.

Similarly, I conclude that the amalgamation agreement between the Agribiotics companies constituted a valid transfer of Agribiotics, Inc.'s rights in the '664 patent to the amalgamated Agribiotics Inc.  Federal law does not require that the amalgamation agreement identify each patent that is being transferred, particularly where the agreement did not

15

identify any asset specifically.  Rather, the agreement states simply that the companies agreed to "amalgamate" and "to continue as one corporation."  Dkt. #22-5.

In sum, the documents submitted by plaintiffs trace plaintiff EMD Canada's co-ownership of the '664 patent through an unbroken assignment chain from the original inventors to EMD Canada.  They show that EMD Canada is a co-owner of the '664 patent.

2. McGill University as indispensable party

Although plaintiff EMD Canada is a co-owner of the '664 patent, the question remains whether McGill University, the other co-owner, must be a plaintiff in this case.  As mentioned above, when a patent is co-owned, a joint owner must join all other co-owners to establish standing, unless the plaintiff co-owner possesses all substantial rights in the patent.  Enovsys LLC, 614 F.3d at 1341; Israel Bio-Engineering Project, 475 F.3d at 1264-65.  If the non-party co-owner has transferred "all substantial rights" in the patent-in-suit to the other co-owner through a license, the transfer is tantamount to an assignment of the patent, conferring standing to sue solely on the licensee.  Alfred E. Mann Foundation for Scientific Research v. Cochlear Corp., 604 F.3d 1354, 1359-60 (Fed. Cir. 2010).  If the non-party co-owner has not transferred all substantial rights, it is a necessary party to the infringement case.  Id.

Plaintiff EMD Canada contends that McGill University is not a necessary party

because McGill granted all substantial rights in the '664 patent to EMD Canada through the license agreement negotiated initially between McGill and Agribiotics Holdings.  Defendant contends that the license did not grant all substantial rights to EMD Canada for two reasons. First, the McGill license was not transferred properly to EMD Canada because Agribiotics Holdings violated an anti-assignment clause prohibiting transfer of the license without prior written consent by McGill.  Dkt. #22-3, § 13.1 ("The rights and obligations under this Agreement may not be assigned or transferred by either party without the prior written consent of the other party.") Second, Agribiotics Holdings violated the clause when it attempted to transfer its license to the Agribiotics Inc. entity in the 2006 amalgamation without first obtaining written consent from McGill.

It is not clear whether defendant is the correct party to assert a breach of the agreement, when it is not a party to the license agreement.  However, it is irrelevant whether Agribiotics Holdings violated the anti-assignment clause of the license agreement because plaintiffs have submitted evidence showing that McGill agreed to the transfer and that EMD Canada is the current licensee under the agreement.  Plaintiffs submitted a document titled "Amendment #1 to License Agreement with EMD Crop Bioscience "Technologies: Emerge (99032), Signal (#94038) and Photosynthesis (#99093)," that was executed by EMD Canada and McGill on October 16, 2008.  Dkt. #35-3.  The document states that it is incorporating changes into

17

the License Agreements all executed June 28, 2004, initially between McGill University and Agribiotics Holdings Inc.  The rights of all of the licenses were subsequently transferred to Nitragin Inc. upon their acquisition of Agribiotics Holdings Inc. on March 24, 2006.  Subsequently, Nitragin Inc. changed its name to EMD Crop BioScience as of August 1, 2006.

It would have been useful for plaintiffs to submit an affidavit or other evidence stating explicitly that McGill University had consented to a transfer of the license.  However, because this document has been signed by McGill and states the chain of title through which plaintiff EMD Canada eventually became licensee under the license agreement, the document is evidence that, either before or after assignment of the license, McGill consented to EMD Canada's becoming the licensee under the agreement.  Defendant has not rebutted this evidence.

The question remains whether the license is tantamount to an assignment that transferred "all substantial rights" to EMD Canada, allowing EMD Canada to sue without joining McGill University.  This inquiry is fact intensive, requiring courts to "ascertain the intention of the parties [to the license agreement] and examine the substance of what was granted" and what rights were retained by the grantor.  Mann Foundation, 604 F.3d at 1359 (quoting Mentor H/S, Inc. v. Medical Device Alliance, Inc., 240 F.3d 1016, 1017 (Fed. Cir. 2001)); see also State Contracting & Engineering Corp. v. Condotte America, Inc., 346 F.3d 1057, 1063 (Fed. Cir. 2003) ("In determining whether a grant of all substantial rights was intended, it is useful to examine what rights, if any, were retained by the transferor.")

18

The Court of Appeals for the Federal Circuit has listed several rights that should be examined to determine whether a licensor has transferred sufficient rights to render a licensee an owner of a patent, including:

- whether the license transfers exclusive right to make, use and sell products or services under the patent;

- the scope of licensee's right to sublicense;

- the nature of license provisions regarding the reversion of rights to the licensor following breaches of the license agreement;

- the right of the licensor to receive a portion of the recovery in infringement suits brought by the licensee;

- the duration of the license rights granted to the licensee;

- the ability of the licensor to supervise and control the licensee's activities;

- any obligation of the licensor to continue paying patent maintenance fees; and

- the nature of any limits on the licensee's right to assign its interests in the patent.

Mann Foundation, 604 F.3d at 1360-61; see also Intellectual Property Development, Inc. v. TCI Cablevision of California, Inc., 248 F.3d 1333, 1345 (Fed. Cir. 2001); Mentor H/S, 240 F.3d at 1018; Prima Tek II, LLC v. A-Roo Co., 222 F.3d 1372, 1378-79 (Fed. Cir. 2000); Vaupel Textilmaschinen KG v. Meccanica Euro Italia SPA, 944 F.2d 870, 875 (Fed. Cir. 1991).

However, as the court explained in Mann Foundation, 604 F.3d at1361, "the nature

19

and scope of the licensor's retained right to sue accused infringers is the most important factor in determining whether an exclusive license transfers sufficient rights to render the licensee the owner of the patent."  "Where the licensor retains a right to sue accused infringers, that right often precludes a finding that all substantial rights were transferred to the licensee."  Id.  In Mann Foundation, the court analyzed the respective litigation rights of the licensor and licensee and concluded the licensor had not granted "all substantial rights" to the licensee.  Id. at 1361-62.  In that case, the licensee had the absolute right to decide whether to initiate litigation against an accused infringer.  Id. at 1361.  If the licensee chose to sue, it controlled the litigation completely, but if it chose not to file suit against an accused infringer, the licensor had the option of filing suit.  The court noted that

> [w]hile [the licensor's] right to choose to sue an infringer does not vest until [the licensee] chooses not to sue that infringer, it is otherwise unfettered.  Once its right to sue an infringer activates, [the licensor] can decide whether or not to bring suit, when to bring suit, where to bring suit, what claims to assert, what damages to seek, whether to seek injunctive relief, whether to settle the litigation, and the terms on which the litigation will be settled.

Id. at 1362.  "Such a broad right to decide whether to bring suit and to control litigation is thoroughly inconsistent with an assignment of the patents-in-suit to [the licensee]."  Id.

In this case, the infringement litigation provisions contained in the McGill license agreement are very similar to those in Mann Foundation.  Compare dkt. #22-3, §§ 11.1-11.3, with Mann Foundation, 604 F.3d at 1361-62.  Both McGill and EMD Canada are

20

required to notify the other party upon learning of a possible infringement of the patent. After this notification, EMD Canada has the right and obligation to stop the infringement, file suit against the infringer or enter into a settlement with the infringer.  If EMD Canada chooses to file suit, it has the right to any damages.  If EMD Canada settles a dispute, McGill has the right to a "pass-through royalty."  If EMD Canada does not stop infringement, file suit against an infringer or enter into settlement with an infringer within six months of discovering the potential infringement, McGill has the right, "at its own expense and for its own benefit, to bring any action it deems necessary to stop the infringement and recover any damages, profits, and awards which might be obtained."  In addition, if EMD Canada does not file suit or otherwise stop the infringement, EMD Canada's rights under the agreement become "non-exclusive" and McGill has the right to grant licenses to others.  Under the holding in Mann Foundation, when a licensor retains such rights to sue, it has not transferred "all substantial rights" to the licensee.  Mann Foundation, 604 F.3d at 1363; see also AsymmetRX, Inc. v. Biocare Medical, LLC, 582 F.3d 1314, 1321 (Fed. Cir. 2009) (finding retained litigation rights sufficient to preserve licensor's ownership of patents-in-suit); Sicom Systems, 427 F.3d at 978-79 (finding that licensor maintained ownership of patents-in-suit when that licensor retained right to sue only noncommercial accused infringers, having transferred to licensee sole and unconditional right to sue commercial infringers).

21

There is one difference between the infringement provisions of the license in <u>Mann Foundation</u> and those of plaintiff EMD Canada's license agreement. Plaintiffs contend that regardless whether McGill retained the right to sue in certain situations, § 11.2.2 of the license actually *prohibits* McGill from suing to enforce the '664 patent. Section 11.2.2 states that EMD Canada has no obligation to "notify McGill, to stop the infringement or to sue the infringer" with regard to any product that incorporates United States Patent Serial Number US 10/146,034, regardless whether the product infringes the patents covered by the license agreement. The product at issue in this case, defendant's Vault HP product, is covered by § 11.2.2 because the product incorporates a patent that issued from application serial no. 10/146,034. Plaintiffs contend that under § 11.2.2, McGill has no right to sue for infringement by the Vault HP product. Defendant contends that plaintiffs misread § 11.2.2, which relates only to the licensee's lack of obligation to sue or notify McGill of infringement by certain products, and says nothing of McGill's ability to sue under the '664 patent.

The meaning of § 11.2.2. is ambiguous. Both parties offer plausible explanations. On one hand, plaintiffs' explanation is sensible in the context of the proceeding provision, § 11.2.1, which indicates that McGill "shall have the right" to sue if EMD Canada fails to stop infringement. Under one interpretation of § 11.2.1, McGill has a right to sue only in those situations in which the licensee is required to sue but fails to do so. Thus, because the licensee is never required to sue when §11.2.2 applies, McGill has no right to sue in these

circumstances.

On the other hand, because McGill is an owner of the patent, the presumption is that it has the right to enforce its patents unless it explicitly gives up those rights. In fact, § 3.4 of the license agreement states that McGill reserves "[a]ll rights not expressly granted." Section 11.2 is titled "Obligation to Enforce," and addresses primarily the licensee's obligations under the patent. The section is not titled "relinquishment of McGill's right to enforce" or something of that nature. Although McGill limits its right to enforce the patent in situations in which the licensee is obligated to enforce the patent, McGill may have intended to retain the right to enforce the patent freely in situations in which the licensee has no obligation to enforce, specifically those situations that fall under § 11.2.2. Plaintiffs have provided no evidence that would shed light on the intention of the parties under this agreement. In fact, plaintiffs offer no rationale for § 11.2.2 at all. If plaintiffs had undertaken to explain why the parties to the license agreement chose to exempt certain products from the licensee's enforcement obligation, it might be possible to determine the meaning of § 11.2.2. Unfortunately, plaintiff EMD Canada did not do so. As the party with the burden of establishing standing, EMD Canada has not shown that McGill has given up the right to enforce the '664 patent. Under the rule in <u>Mann Foundation</u>, McGill has not given up "all substantial rights" because it retains a right to sue for infringement.

Even if plaintiffs were correct about § 11.2.2, McGill retains other substantial rights

23

under the patent that the court identified in <u>Mann Foundation</u> as significant to the standing analysis.  <u>Mann Foundation</u>, 604 F.3d at 1360-61.  For example, McGill retains the right to use the patent for itself and for the benefit of third parties, although its use is limited to academic purposes.  Also, McGill placed limits on EMD Canada's right to grant sublicenses, § 3.2.  McGill retains the right to consult with EMD Canada regarding the prosecution and maintenance of the patents and retains the right to modify or terminate the agreement in the event that EMD Canada fails to use "commercially reasonable efforts to develop and market" the patents, § 7.1, fails to stop certain infringement or breaches the agreement in any other material way.  Finally, the license agreement limits EMD Canada's ability to assign its rights under the patent, requiring EMD Canada to receive McGill's consent prior to transfer.

In sum, although plaintiff EMD Canada is a co-owner of the '664 patent, McGill University has retained a significant amount of interest in the '664 patent and has not relinquished all substantial rights under the patent.  Therefore, I find that EMD Canada has no standing to sue for infringement without joinder of McGill University.

3.  <u>Joinder of McGill University</u>

Plaintiffs contend that even if McGill University is a necessary party to this action, McGill can be joined as an involuntary plaintiff under the terms of the license agreement

24

between the parties.  In particular, plaintiffs point to § 11.3 of the license, which states that plaintiff EMD Canada has the right "to bring suit in its own name, or if required by law, jointly with McGill. . . ."  This section suggests that McGill has waived its right to refuse to join infringement actions.  Moreover, because EMD Canada is required by the patent to stop infringement, it is arguable that the agreement imposes a corollary duty on McGill to allow EMD Canada to sue in McGill's name.

A necessary party may be joined under Fed. R. Civ. P. 19(a).  If the party refuses to join, Rule 19(a)(2) provides the mechanism by which a required non-party may be joined involuntarily.  In patent infringement cases, "[a] patentee that does not voluntarily join an action prosecuted by its exclusive licensee can be joined as a defendant, or in a proper case, made an involuntary plaintiff. . . ."  AsymmetRX, 582 F.3d at 1322 (quoting Abbott Laboratories v. Diamedix Corp., 47 F.3d 1128, 1133 (Fed. Cir. 1995)).  A party who wishes to join an absent party as a plaintiff under Rule 19(a)(2) must first ask the absent party.  Independent Wireless Telegraph Co. v. Radio Corp. of America, 269 U.S. 459, 473 (1926) ("The owner beyond the reach of process may be made coplaintiff by the licensee, but not until after he has been requested to become such voluntarily."); Charles Alan Wright, Arthur R. Miller & Mary Kay Kane, 7 Federal Practice & Procedure § 1606 (3d ed. 2009).

Joinder of a patent co-owner is a prudential, not a constitutional standing requirement, and the Court of Appeals for the Federal Circuit has allowed parties to cure

25

prudential standing defects after filing.  E.g., Intellectual Property Development, 248 F.3d at 1348; Abbott Laboratories, 47 F.3d at 1133-34.  Thus, although I conclude that plaintiff EMD Canada must join McGill University as a party to this action to proceed with its patent infringement claim, I will deny defendant's motion to dismiss at this time and will give plaintiff an opportunity to join patent owner McGill University as a necessary party under Rule19 to satisfy its standing requirements.  In the event that plaintiff does not add McGill University as a party within 30 days of this order, I will dismiss plaintiff EMD Canada's patent infringement claim for lack of standing.

## B.  False Marking

35 U.S.C. § 292 provides that "[w]hoever marks upon, or affixes to . . . any unpatented article, the word 'patent' or any word or number importing that the same is patented, for the purpose of deceiving the public . . . Shall be fined not more than $500 for every such offense."  False marking under 35 U.S.C. § 292 is a *qui tam* claim, meaning that a plaintiff may pursue an action on behalf of the government as well as himself.  Vermont Agency of Natural Resources v. United States ex rel. Stevens, 529 U.S. 765, 768 n.1 (2000) (listing § 292(b) as one of four *qui tam* statutes in force currently); Pequignot v. Solo Cup Co., 608 F.3d 1356, 1359 (Fed. Cir. 2010) (referring to § 292 as *qui tam* provision).  Defendant contends that plaintiffs' false marking claim should be dismissed for lack of

standing under Fed. R. Civ. P. 12(b)(1) and for failure to state a claim upon which relief may be granted under Rule 12(b)(6).  I will address these arguments in turn.

The constitutional requirement of standing provides that all plaintiffs must have (1) suffered an injury in fact, (2) that is fairly traceable to conduct of the defendant and (3) may be redressed by the court.  Lujan v. Defenders of Wildlife, 504 U.S. 555, 560-61 (1992). Defendant contends that plaintiffs lack standing because they have failed to allege any injury caused by defendant's alleged false marking.  In particular, defendant contends that the vague statement in the complaint that "each expired patent marked on the Vault HP product is likely to or has the potential to discourage or deter others from commercializing a competing product," Plts.' Cpt, dkt. #2, ¶ 34, is too conjectural and hypothetical to confer standing.  Plaintiffs respond that their complaint pleads a personal injury implicitly because plaintiffs are competitors of defendant who will be deterred from commercializing a competing product.  In any event, plaintiffs argue, they do not have to plead a personal injury because injury to the United States is sufficient to confer standing.

Plaintiffs are correct.  Under Vermont Agency, 529 U.S. at 773, a *qui tam* plaintiff can establish standing based on the United States' injury in fact, even if the plaintiff suffered no injury.  In addition, the Court of Appeals for the Federal Circuit held recently that "a violation of [§ 262] inherently constitutes an injury to the United States" because "Congress determined that such conduct is harmful and should be prohibited."  Stauffer v. Brooks

27

Brothers, Inc., — F.3d —, 2010 WL 3397419, *4 (Fed. Cir. Aug. 31, 2010).  Thus, a plaintiff bringing a suit under § 262(b) does not need to allege a personal injury to himself or herself or a specific injury to the United States.  Alleging that defendant has engaged in false marking is sufficient.  Id. at *6.  Therefore, plaintiffs have established standing for their false marking claim.

Defendant's Rule 12(b)(6) argument is that the court should dismiss the false marking claim because it is is grounded in fraud and plaintiffs have failed to plead it with the required particularity under Rule 9(b).  Under Rule 9(b), a party alleging fraud or mistake must "state with particularity the circumstances constituting fraud or mistake."  The term "circumstances" refers to the specific "who, what, where, when, and how" surrounding the misrepresentation.  DiLeo v. Ernst & Young, 901 F.2d 624, 627 (7th Cir. 2009).  Plaintiffs have alleged adequately the "who, what, where, when and how" surrounding the defendant's false marking.  In particular, plaintiffs allege that defendant marked its Vault HP with two expired patents.  Plts.' Cpt., dkt. #2, ¶ 16.  Plaintiffs pleaded that defendant revised its package material in November 2009 and that defendant began shipping the product in spring 2010.  Id. at ¶¶ 17, 22.

Rule 9(b) allows intent or "other conditions of a person's mind" to be alleged generally.  However, the pleadings must "allege sufficient underlying facts from which a court may reasonably infer that a party acted with the requisite state of mind."  Exergen

28

Corporation v. Wal-Mart Stores, Inc., 575 F.3d 1312, 1327 (Fed. Cir. 2009); see also Robin v. Arthur Young & Co., 915 F.2d 1120, 1127 (7th Cir. 1990) (stating that "while the defendant's mental state need not be pleaded with particularity, 'the complaint must still afford a basis for believing that plaintiffs could prove scienter'") (citation omitted). Where a party making a misrepresentation has knowledge of the misrepresentation, intent to deceive can be inferred. Clontech Laboratories, Inc. v. Invitrogen Corp., 406 F.3d 1347, 1352 (Fed. Cir. 2005). Thus, to survive a motion to dismiss, a plaintiff must allege specific facts to suggest plausibly that a defendant had knowledge of the mismarking. Ashcroft v. Iqbal, 129 S. Ct. 1937, 1949 (2009) (stating that to defeat motion to dismiss brought pursuant to Rule 12(b)(6), "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face").

Defendant contends that plaintiffs' allegations do not allow a reasonable inference that defendant acted with an "intent to deceive." Plaintiffs allege that at the time defendant revised its package material and marked its Vault HP package, it knew, or should have known, that one or more of the patents marked on the Vault HP product had expired. Id. at ¶¶ 31-34. Although plaintiffs' allegations are somewhat conclusory, they have alleged that defendant was aware that the patent was expired. The court must accept this allegation as true at the motion to dismiss stage. Plaintiffs' allegation permits an inference that defendant marked its packages with an intent to deceive the public. Therefore, I will deny defendant's

29

motion to dismiss plaintiffs' false marking claim.

## ORDER

IT IS ORDERED that

1. Defendant Becker Underwood Inc.'s motion to dismiss, dkt. #9, is GRANTED IN PART and DENIED IN PART.  Defendant's motion to dismiss plaintiffs' false marking claim is DENIED. Defendant's motion to dismiss plaintiff EMD Crop Bioscience Inc.'s patent infringement claim is GRANTED.  Defendant's motion to dismiss plaintiff EMD Crop Bioscience Canada Inc.'s patent infringement claim is DENIED without prejudice.

2. Plaintiff EMD Crop Bioscience Canada Inc. is GRANTED leave to join patent co-owner McGill University as a necessary party under Fed. R. Civ. P. 19 to satisfy its standing requirement.  If EMD Crop Bioscience Canada Inc. does not add McGill University as a party within 30 days of this order, I will dismiss its patent infringement claim.

Entered this 28th day of October, 2010.

BY THE COURT:
/s/
BARBARA B. CRABB
District Judge